UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------------------x
:
HEATHER L. DAVIS                         :         3:11 CV 875 (CSH)
                                         :
V.                                       :
                                         :
MICHAEL J. ASTRUE,                       :
COMMISSIONER OF SOCIAL SECURITY          :         DATE: MAY 11, 2012
                                         :
--------------------------------------------------------- x

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR ORDER REVERSING THE
DECISION OF THE COMMISSIONER AND FOR REMAND, AND ON DEFENDANT'S MOTION
TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"][1] and Supplemental Security Income ["SSI"] benefits.

I.   ADMINISTRATIVE PROCEEDINGS

On or about March 3, 2009, Heather L. Davis applied for DIB and SSI claiming that she has been disabled since June 30, 2005,[2] due to anxiety, panic attacks, bipolar disorder, post-traumatic stress disorder ["PTSD"], depression, a learning disability, and asthma. (Certified Transcript of Administrative Proceedings, dated July 13, 2011 ["Tr."] 199-202, 215,

---

[1] <u>See</u> note 2 <u>infra</u>.

[2] Plaintiff's disability insured status expired on June 30, 2005. (Tr. 7, 224, 242; <u>see</u> Tr. 205). Thus, at her hearing before the ALJ, plaintiff amended her onset date to March 3, 2009, and converted this to a claim for SSI benefits only; after the expiration of her insured status, she is not eligible for DIB. (Tr. 24); 20 C.F.R. § 404.315(a)(1).

Plaintiff's husband receives SSI.  (<u>See</u> Tr. 199).

217; see Tr. 7, 24, 182-83).[3] On March 20, 2010, plaintiff applied again for DIB. (Tr. 176-79). These applications were denied initially and upon reconsideration. (Tr. 97-113; see Tr. 41-93). On March 2, 2010, plaintiff filed a request for a hearing by an Administrative Law Judge ["ALJ"](Tr. 114; see Tr. 115-36), and on December 3, 2010, a hearing was held before ALJ Marlene W. Heiser, at which plaintiff and Courtney Olds, a vocational expert, testified. (Tr. 20-40; see Tr. 137-64). Plaintiff was represented by counsel. (Tr. 20, 95-96, 165-66). In a decision dated December 17, 2010, plaintiff was found not disabled. (Tr. 4-14). Plaintiff's claim was selected for review by the Decision Review Board ["DRB"], and on March 22, 2011, the DRB informed plaintiff that it did not complete a timely review of plaintiff's claim, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On May 27, 2011, plaintiff, proceeding pro se, filed her Complaint in this pending action,[4] and six days later, this case was referred from Senior United States District Judge Charles S. Haight, Jr. to this Magistrate Judge. (Dkts. ##1, 4). On August 17, 2011, defendant filed his Answer and the certified administrative transcript. (Dkt. #12).[5] On November 21, 2011, plaintiff filed her Motion to Reverse the Decision of the Commissioner. (Dkt. #15; see Dkts. ##6, 13, 14). On March 23, 2012, defendant filed his Motion to Affirm the Decision of the Commissioner, with brief in support. (Dkt. #21; see Dkts. ##16-20).

For the reasons stated below, plaintiff's Motion to Reverse the Decision of the Commissioner (Dkt. #15) is denied, and defendant's Motion to Affirm the Decision of the

---

[3]Plaintiff also filed applications for DIB in 2003, 2005 and 2009 (Tr. 167-75, 182-83; see also Tr. 205, 217 (reflecting onset date of January 1, 2004)), and filed applications for SSI in 2003, 2005 and 2009 as well. (Tr. 182-83).

[4]Plaintiff commenced this action in forma pauperis. (Dkts. ##2, 5).

[5]The certified administrative transcript is dated July 13, 2011.

2

Commissioner (Dkt. #21) is granted.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1977 and is thirty-four years old. (Tr. 25). At her hearing, plaintiff testified that she is 5'2" and weighs 246 pounds. (Tr. 25-26; see also Tr. 216 (210 pounds at the time she filed her application)). Plaintiff has a twelfth grade, home-schooled education (Tr. 25; see Tr. 292 (high school education plus two years of college in Hotel and Restaurant Management)),[6] and she lives with her husband and two and a half year old son. (Tr. 30). Additionally, plaintiff has three daughters and two sons, of whom she sees only one daughter who lives with plaintiff's parents in Massachusetts; she does not see the other four children. (Tr. 33). When she visits the one daughter in Massachusetts, she colors with her and takes her to McDonald's. (Tr. 34).

According to plaintiff, she has a hard time with her anxiety and depression and gets "too overwhelmed[.]" (Tr. 27). She has nightmares and she shakes. (Tr. 209). She has been hospitalized for a week in the past, and seeks treatment at the emergency room. (Tr. 27). Additionally, she reported that she receives mental health treatment on a weekly basis. (Id.). At her hearing, plaintiff testified that she goes off her medications often, at times for a month and a half at a time. (Tr. 28-29). When she feels anxious, she locks herself in her room for four to five hours, which she does "[m]ostly, every day." (Tr. 29). When she locks herself in the room, her husband, who does not work,[7] takes care of the baby. (Tr. 30, 32). However, other times, she feeds her son, bathes him, dresses him, and takes him for walks. (Tr. 32). Her husband cooks, cleans, grocery shops, and does laundry, and he goes with

---

[6]Plaintiff testified that she was home schooled after she was raped in high school, when she was fifteen years old. (Tr. 34).

[7]See note 2 supra.

3

plaintiff whenever she leaves the house. (Tr. 30-31).[8]

An average day for plaintiff consists of feeding the baby, changing him, sitting in her room while her husband cooks, and then staying in the house and playing with her son for the remainder of the day. (Tr. 32-33). Plaintiff reports that her medications cause her to eat a lot, and when she prepares meals, they consist of TV dinners and sandwiches. (Tr. 210). Plaintiff takes Advair and Albuterol for her asthma, which is triggered by weather, dust, pollen, trees, walking up stairs, and anxiety. (Tr. 35-36). In addition, plaintiff takes or has taken Hydroxyzine/Vistaril, Sertraline/Zoloft, Divalproex/Depakote, and Zyprexa, for which plaintiff needs reminders. (Tr. 209-10, 237, 261).

According to plaintiff, she has problems concentrating, and she cannot focus. (Tr. 31; see also Tr. 213). Additionally, during her intake interview when she filed her 2009 application for benefits, it was noted that plaintiff had problems with understanding, coherency, concentrating, talking and answering. (Tr. 206). Plaintiff also reported problems with her memory and lifting, standing, walking, sitting, talking, climbing stairs, understanding, completing tasks, and following instructions. (Tr. 213). According to plaintiff, some of these problems are related to a learning disability. (Tr. 214).

Plaintiff worked for Dunkin' Donuts from 1992 or 1995 to 1997, at which job she sat to frost and/or fill donuts, and worked the cash register. (Tr. 26, 218, 258, 262; see Tr. 180, 191-92, 253). Both her mother and sister worked at Dunkin' Donuts with her. (Tr. 35). Plaintiff would walk, stand, stoop, crouch, handle, and reach for three or more hours of the work day, and the heaviest weight she lifted was between twenty to fifty pounds. (Tr. 218, 253, 258). Plaintiff did not stay employed in other jobs because she would get overwhelmed

---

[8]However, when plaintiff completed her 2009 application for benefits, she reported that she cleaned the house and did the laundry. (Tr. 211).

and could not handle it by herself.  (Tr. 35; see generally Tr. 192-95, 252, 254-57, 263).

### A. MEDICAL RECORDS

As discussed above, plaintiff's amended onset date of disability is March 3, 2009.[9] In late December 2008 and January 2009, plaintiff sought treatment at Waterbury Hospital's Crisis Intervention Outpatient Center after she ran out of medication; she was treated for bipolar disorder, anxiety, and depression, was prescribed Zoloft, Vitaril, Depakote, and Zyrexa, and was directed to follow-up with Grandview Behavioral Health.  (Tr. 300-15, 353-66; see Tr. 350-51).[10]  At that time, plaintiff was living in Safe Haven after her boyfriend tried to kill her.  (Tr. 305, 308, 358, 361).

On March 10, 2009, plaintiff presented to the St. Mary's Hospital emergency room complaining of an anxiety attack, difficulty breathing, sweating, and slight hyperventilation.  (Tr. 343-44).  Ten days later, plaintiff underwent a psychiatric evaluation at Waterbury Hospital, during which she reported a history of bipolar disorder and outpatient treatment, and a lack of consistent medication.  (Tr. 345-47, 375-77).  She was "quite vague about her symptoms[,]" and she reported continued depression and anxiety.  (Tr. 345, 375). Plaintiff's affect was appropriate, with a mildly depressed mood, her thoughts were clear and organized, and her cognition and judgment were intact.  (Tr. 346, 376).  She was assigned a GAF of 55.  (Tr. 347, 377). Plaintiff was seen for medication management through Waterbury Hospital's outpatient services, during which time her concentration was fair, her mood/affect were labile, and she was fully oriented.  (Tr. 348-49, 370-74, 378-81).

---

[9]The record is replete with records, many of which reflect missed appointments, from dates earlier for treatment for depression, along with other routine appointments. (See Tr. 264-99).

[10]On January 1, 2009, plaintiff was treated at the Waterbury Hospital Emergency Room for knee pain, for which she was given Vicodin, and prescriptions for Prednisone and Hydrocodone. (Tr. 317-42).

5

On April 23, 2009, plaintiff underwent a consultative examination with Dr. Rahim Shamsi for Connecticut Disability Determination Services ["CT DDS"]. (Tr. 367-69). Plaintiff reported two past psychiatric hospitalizations, with the last a few months earlier due to a suicide attempt by a medication overdose. (Tr. 367).[11] Dr. Shamsi noted that plaintiff's psychomotor activity was moderately retarded, she had moderate depression and mild anxiety, and she was "somewhat disoriented[.]" (Tr. 368). Her past memory was impaired, and Dr. Shamsi opined that she has a thought disorder, her thought processes were slow, her intelligence could be considered at the upper limits of borderline, and her judgment was "somewhat poor[.]" (Id.). He diagnosed plaintiff with major affective disorder, bipolar, possible with psychotic features, and panic disorder with agoraphobia. (Id.). He opined that plaintiff was in need of "much more aggressive psychiatric treatment[,]" and based on his evaluation, Dr. Shamsi concluded that plaintiff was not able to engage in any gainful activity. (Tr. 368-69).

On May 12, 2009, Robert Decarli, PsyD, completed a Psychiatric Review Technique and Mental Residual Functional Capacity Assessment of plaintiff for SSA in which he noted the existence of Listing 12.02 Organic Mental Disorders and 12.04 Affective Disorders. (Tr. 59-63). Dr. Decarli concluded that plaintiff has moderate difficulties in maintaining social functioning, concentration, persistence or pace, is moderately limited in her ability to understand, remember, and carry out detailed instructions, and is moderately limited in her ability to maintain attention and concentration for extended periods. (Tr. 59, 61). According to Dr. Decarli, plaintiff could have problems with prolonged concentration and detailed instructions due to a periodic low mood, and while she could relate to coworkers and

---

[11] There are no records of hospitalizations for these reasons in the administrative transcript before this Court.

6

supervisors while doing simple tasks, she would perform best in a job away from the public.[12] (Tr. 62).

Plaintiff continued to receive medication management through Waterbury Hospital, and on May 18, 2009, plaintiff reported that she was pregnant, at which time plaintiff was advised to stop taking her psychiatric medications. (Tr. 371; see Tr. 383-96, 418-30, 454-60 (pregnancy and birthing records)). Her mood had improved and she was fully oriented at that time, and again when she was seen in July 2009. (Tr. 371-73, 382).

On July 25, 2009, Dr. Marsha Hahn reviewed plaintiff's record for CT DDS, from which she concluded that plaintiff has affective disorder and anxiety disorder, with mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence or pace, and has experienced no episodes of decompensation. (Tr. 88-91). According to Dr. Hahn, plaintiff is moderately limited in her ability to remember very short and simple instructions, to understand, remember and carry out detailed instructions, and to maintain concentration and attention for extended periods. (Tr. 90). Additionally, plaintiff is moderately limited in her ability to complete a normal workday and workweek as she could have problems with prolonged concentration and with detailed instructions due to a periodic low mood. (Tr. 91). According to Dr. Hahn, plaintiff could relate to coworkers and supervisors while doing simple tasks but would perform best in a job away from the public. (Id.). Similarly, after reviewing plaintiff's medical records, Dr. Carol Honeychurch concluded that plaintiff does not have a medically determinable impairment. (Tr. 87-88).

---

[12]Portions of Dr. Decarli's opinion are repeated, verbatim, by Dr. Hahn. (Compare Tr. 62 with Tr. 91).

There are no treatment records for plaintiff's mental condition until March 2010,[13] when plaintiff began treatment for five months at Family Services of Greater Waterbury, Inc. ["Family Services"]. (Tr. 478-82). Plaintiff was referred by DCF, and she reported feelings of depression and PTSD symptoms. (Tr. 478-80). Her affect was sad and her mood was depressed but her thought process was intact, as was her memory, cognitive function, judgment, insight and concentration. (Tr. 481). Plaintiff was assigned a GAF of 60. (Tr. 482). In April 2010, plaintiff was seen at Grandview Adult Outpatient Services for depression and was prescribed Zyprexa, Clonodine, Depakote, and Zoloft. (Tr. 397-98, 462-63). Similarly, plaintiff was seen for medication management at Family Services where she was prescribed Zoloft and Vistaril. (Tr. 484-85; see Tr. 486, 489). Plaintiff's treatment relationship at Family Services ended in August 2010 because plaintiff had not been taking medication as prescribed. (Tr. 478). In November, plaintiff restarted treatment with a new therapist at Family Services after plaintiff reported that she had run out of medication and wanted to resume treatment. (Tr. 487-88). Plaintiff was assigned a GAF of 51. (Tr. 488). In that same month, plaintiff was seen at Staywell Health Care, Inc. in Waterbury for a general medical examination as she had not had a primary care physician since 2008. (Tr. 465-71, 490-94). Plaintiff reported that she was not taking any medications, her asthma was mild, intermittent, and she was placed on medication for hypertension. (Tr. 469).

B. VOCATIONAL EXPERT TESTIMONY

At plaintiff's hearing, the vocational expert testified that plaintiff's past work was as

---

[13] In September 2009, plaintiff presented to the Waterbury Hospital emergency room with complaints of chest pain and difficulty breathing (Tr. 400-13, 431-38), and was seen for bronchitis in early December 2009. (Tr. 439-53). Plaintiff's baby was born on December 29, 2009. (See Tr. 425-28, 459-60). In August 2010, she was seen in the emergency room at St. Mary's Hospital with complaints of abdominal pain. (Tr. 472-77).

8

a counter worker, which is unskilled work, performed at the light exertional level. (Tr. 37). The ALJ then asked the vocational expert if an individual could do plaintiff's past work if the individual should not be exposed to extreme cold, heat, wetness, humidity or dust, and is limited to simple, routine, repetitive tasks involving short simple instructions in an environment with few work place changes, with no strict time or production quotas, no contact with the public, and only brief and frequent superficial contact with supervisors and coworkers. (Tr. 37-38). The vocational expert responded that such an individual could not perform plaintiff's past work because it would involve "a lot of work with the public[,]" but such an individual could perform unskilled, entry level work, such as work as a hand packer, or a machine operator doing simple assembly work. (Tr. 38). However, in response to plaintiff's counsel's inquiry into whether such a hypothetical worker would be able to perform those jobs if she had to take breaks and was off task due to mental illness fifteen to twenty percent of the time, the vocational expert testified, no, because even with unskilled jobs, the worker has to be "on task pretty much the whole day." (Tr. 39).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23

F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working.  See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See 20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment

meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. § 404.1520(e). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"]. The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled. See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations). A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered. See 20 C.F.R. § 200.00(e)(2). If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity. See Pratts v.

Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Heiser found that plaintiff has not engaged in any substantial gainful activity since March 3, 2009, the alleged onset date. (Tr. 9). ALJ Heiser then concluded that plaintiff has the following severe impairments: bipolar disorder, PTSD, and asthma. (Tr. 9-10). In the third step of the evaluation process, the ALJ concluded that plaintiff's impairments or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404. (Tr. 10). In addition, at step four, ALJ Heiser found that plaintiff is able to perform a full range of work at all exertional levels but with the following nonexertional limitations: she can have no exposure to extreme cold, heat, humidity, or dust; she is limited to simple, routine, repetitive tasks involving short, simple instructions in an environment with few workplace changes, no strict time or production quotas, no public contact, and only brief, infrequent, superficial contact with supervisors and co-workers. (Tr. 10-12). The ALJ concluded that considering plaintiff's younger age, her education, work experience, and residual functioning capacity, there are jobs that exist in significant numbers in the national economy that she can perform, and thus, plaintiff has not been under a disability since March 3, 2009, through the date of the ALJ's decision. (Tr. 12-13).

Plaintiff moves for an order remanding this case on grounds that the ALJ did not properly consider the evidence of the severity of plaintiff's impairments by not considering her severe impairments of agoraphobia with panic attacks, headaches, and obesity, in combination with her documented bipolar disorder, post traumatic stress disorder, and asthma; the ALJ did not properly evaluate the severity of plaintiff's bipolar disorder,

depression, anxiety and panic attacks; the ALJ did not properly include all of plaintiff's limitations and impairments in the hypothetical posed to the vocational expert; the ALJ's decision ignores the vocational expert's opinion; and substantial evidence of the record indicates that plaintiff cannot perform the jobs identified by the vocational expert. (Dkt. #15, at 1-2).

In response, defendant asserts that the ALJ's RFC determination is properly supported by the record; the ALJ properly evaluated Dr. Shamsi's opinion; the ALJ properly considered plaintiff's alleged panic attacks with agoraphobia, headaches and obesity; the ALJ properly evaluated plaintiff's credibility; and the ALJ properly relied on the testimony of the vocational expert. (Dkt. #21, Brief at 8-13).

A. RFC ASSESSMENT

The RFC is the most of what an individual can still do despite his or her limitations. SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."[14]  Id. (emphasis in original). In this case, RFC assessments were completed by Drs. Hahn and Decarli, state agency psychologists. Dr. Hahn opined that plaintiff would work best in a job away from the public and that plaintiff has moderate difficulties in maintaining social functioning, concentration, persistence or pace, has moderate difficulties remembering very short and simple instructions, understanding, remembering and carrying out detailed instructions, maintaining concentration and attention for extended periods, and completing a normal workday and workweek as she could have

---

[14] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." Id.

problems with prolonged concentration and detailed instructions due to a periodic low mood. (Tr. 89-91). Similarly, Dr. Decarli opined that plaintiff could have problems with prolonged concentration and detailed instructions due to a periodic low mood, and while she could relate to coworkers and supervisors while doing simple tasks, she would perform best in a job away from the public. (Tr. 62). In her decision, the ALJ incorporated these limitations[15] into her conclusion that plaintiff can perform simple, routine, repetitive takes involving short, simple instructions in an environment with few workplaces changes, no strict time quotas, no public contact, and only brief, infrequent, superficial contact with supervisors and co-workers. (Tr. 10-12).

While plaintiff asserts that the ALJ ignored the vocational expert's opinion that plaintiff could not perform the jobs identified if she was "off task due to mental illness [fifteen] to [twenty] percent of the time[,]" it was plaintiff's counsel, and not the ALJ, who posed that hypothetical to the vocational expert. (Tr. 39). Furthermore, the ALJ's RFC assessment accounts for the deficiencies in plaintiff's ability to maintain prolonged concentration, as identified by Drs. Kahn and Decarli, as the ALJ found that plaintiff is limited to performing work "with no strict time . . . quotas[.]" (Tr. 11)(emphasis omitted).

### B. SEVERITY AND THE ALJ'S CREDIBILITY DETERMINATION

The ALJ noted plaintiff's reports that she spends hours a day locked in her room, in the past became frustrated at work to the point that she walked out of jobs, and that she has difficulty concentrating. (Tr. 11). However, the ALJ discounted the weight she assigned to these reports in light of plaintiff's failure to consistently take medications, and failure to follow her prescribed treatment. (Tr. 11-12).

---

[15]The ALJ only referenced Dr. Hahn; she did not mention Dr. Decarli's assessment. (Tr. 12).

There are two ways in which plaintiff's non-compliance with her prescribed treatment may be relevant to her claim for SSI. First, a claimant's non-compliance with prescribed medical treatment can be a basis for the denial of benefits if the claimant is disabled solely because she fails to follow prescribed treatment. See 20 C.F.R. § 416.930; see also Social Security Ruling ["SSR"] 82-59, 1982 WL 31384 (S.S.A. 1982).[16] "This rule is applicable where the Commissioner has first determined that the claimant is disabled and only when the Commissioner finds that the claimant's disability would be remediated but for the claimant's unjustified non-compliance with treatment." Smith v. Astrue, No. 09-CV-470 (TJM/VEB), 2011 WL 6739509, at *4 (N.D.N.Y. Nov. 4, 2011), Magistrate Judge's Recommended Ruling adopted absent objection, 2011 WL 6739596 (N.D.N.Y. Dec. 22, 2011).[17] However, if a claimant is found not disabled in the first instance, then 20 C.F.R. § 416.930 does not apply. Id. This latter situation is precisely the case here.[18] Thus, as in this case, if the ALJ considers plaintiff's non-compliance when evaluating her credibility, SSR 96-7p applies, which provides, in relevant part, that a claimant's "statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment prescribed and there are

---

[16] SSR 82-59 provides that a claimant should be given an opportunity to explain why she has failed to follow treatment, the treating physician should be contacted to clarify the treatment that the claimant was told to follow, and the claimant will be notified of the possibility of denial on this basis prior to her hearing before the ALJ.

[17] In this case, the ALJ relied on 20 C.F.R. § 416.930 to support her statement that, "[i]n order to get benefits, a claimant must follow treatment prescribed, if it can restore the ability to work. If a claimant does not follow prescribed treatment, she cannot be found disabled." (Tr. 12, citing 20 C.F.R. § 416.930). However, for the reasons stated below, it is SSR 96-7p that is applicable to this case, not 20 C.F.R. § 416.930, as the ALJ found that neither plaintiff's asthma nor mental impairments rendered her disabled in the first instance.

[18] In this case, the ALJ found that plaintiff was not disabled, and her failure to receive regular treatment was a factor in the ALJ's credibility determination. (Tr. 10-13).

no good reasons for this failure." 1996 WL 374186, at *7 (July 2, 1996).

In this case, plaintiff reported spending her days caring for her then-infant son, and the medical record reflects a three month hiatus after his birth before plaintiff returned for treatment, which was followed by noncompliance with her medication treatment regime. Additionally, the record also reflects improvement in plaintiff's mental state when she stopped her medications during those first three months that she continued treatment once she learned she was pregnant. (See Tr. 371-73, 82). Thereafter, plaintiff stopped seeking mental health treatment from July 2009 until March 2010, and while she was prescribed Zyprexa, Clonodine, Depakote, and Zoloft in April 2010 (see Tr. 397-98, 462-63, 484-85),[19] her treatment relationship at Family Services ended in August 2010 because plaintiff had not been taking medication as prescribed. (Tr. 478). Furthermore, while she resumed treatment in November (see Tr. 487-88), plaintiff reported to another medical provider in that month that she was not taking any medication at that time. (Tr. 469). Accordingly, the ALJ's credibility determination, including her treatment of the severity of plaintiff's complaints and her non-compliance with her medication regime, is supported by the medical evidence of record. See Calabrese v. Astrue, 358 Fed. Appx. 274, 277-78 (2d Cir. 2009)(ALJ's adverse credibility finding was supported by, inter alia, plaintiff's noncompliance with taking prescribed medication).

### C. CONSIDERATION OF ALL OF PLAINTIFF'S IMPAIRMENTS

Plaintiff contends that the ALJ did not properly consider her severe impairments of agoraphobia with panic attacks, headaches, and obesity, in combination with her

---

[19] As of March 2010, plaintiff reported feelings of depression and PTSD symptoms, but her thought process was intact, as was her memory, cognitive function, judgment, insight and concentration. (Tr. 481).

documented bipolar disorder, PTSD, and asthma. (Dkt. #15, at 1). The Social Security Regulations require a claimant to "prove" that . . . she is disabled by "furnish[ing] medical and other evidence" that can be used to reach a conclusion as to the "effects of [a claimant's] impairment(s) on [ her] ability to work . . . ." 20 C.F.R. § 416.912(a); see 20 C.F.R. § 404.1512(a).  Under the second step of the five-step evaluation process, the claimant is required to show that she has an "impairment or combination of impairments which significantly limits [the] physical or mental ability to do basic work activit[y] . . . ." See 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "not severe" when "it does not significantly limit [claimant 's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); see SSR 85-28, 1985 WL 56856, at *3 (S.S.A. 1985).[20] It is harmless error for an ALJ to fail to find an impairment severe as long as the ALJ determines that at least one of the claimant's impairments are severe, and then continues with the remaining steps of the analysis.  Maziarz v. Sec'y of Health and Human Svs., 837 F.2d 240, 244 (6th Cir. 1987); see Swartz v. Barnhart, 188 Fed. Appx. 361, 368 (6th Cir. 2006)(citation omitted)(it is harmless error "as long as the ALJ found at least one severe impairment and continued the sequential analysis and ultimately addressed all of the claimant's in determining her residual functional capacity")(citing Maziarz).

Dr. Shamsi diagnosed plaintiff with panic attacks with agoraphobia,[21] and Dr. Hahn

---

[20]"Basis work activities" are the "abilities and aptitudes necessary to do most jobs[,]" and include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. §§ 404.1521(b), 416.921(b).

[21]As defendant appropriately notes, none of plaintiff's treating physicians diagnosed plaintiff with this condition. (Dkt. #21, Brief, at 11).

relied on Dr. Shamsi's report before completing her RFC assessment, upon which, in turn, the ALJ relied, thereby implicitly considering this impairment. (Tr. 368). See Drake v. Astrue, 443 Fed. Appx. 653, 657 (2d Cir. 2011)(the ALJ implicitly considered an impairment by relying on medical reports which considered that impairment). In this case, the medical evidence does not support a finding that plaintiff's alleged attacks with agoraphobia, headaches, or obesity, resulted in any specific limitations in her residual functional capacity, other than those identified by the ALJ. See Williams ex rel. Williams v. Bowen, 859 F.2d 255, 259 (2d Cir. 1988)(a diagnosis of a listed impairment is not sufficient to demonstrate entitlement to disability benefits).

### D. TREATMENT OF DR. SHAMSI'S OPINION

In her decision, the ALJ gave "little weight" to Dr. Shamsi's opinion that based on his evaluation, plaintiff was not able to engage in any gainful activity. (Tr. 369). Although plaintiff does not contest the ALJ's treatment of this opinion in her motion, defendant correctly acknowledges that "there may appear to be a problem with the ALJ's rejection" of this opinion, as the ALJ's reliance on plaintiff's non-compliance with her medication to discredit Dr. Shamsi's opinion was contrary to the April 2009 medical evidence of record. (Dkt. #21, Brief, at 8-9). However, this erroneous reliance notwithstanding, the ALJ did not err in rejecting his opinion of disability as Dr. Shamsi's assessment was based, at least in part, on plaintiff's subjective reports that are not supported in the medical record. (See Tr. 367).[22] Furthermore, both Drs. Decarli and Hahn[23] reviewed Dr. Shamsi's medical

---

[22] Specifically, plaintiff reported to Dr. Shamsi that she had two past psychiatric hospitalizations, with the last a few months earlier due to a suicide attempt by a medication overdose; there are no records of such hospitalizations in the administrative transcript. (Id.).

[23] In her assessment, Dr. Hahn noted that it was possible that Dr. Shamsi did not know that plaintiff's former boyfriend whom plaintiff reported was "after her[]" (Tr. 367),was arrested and

assessment before reaching their opinions as to plaintiff's RFC, and these RFC assessments were accounted for in the ALJ's decision.

## V. CONCLUSION

For the reasons stated above, plaintiff's Motion for Order to Reverse the Decision of the Commissioner (Dkt. #15) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #21) is granted.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 11th day of May, 2012.

                                                /s/ Joan G. Margolis, USMJ
                                               Joan Glazer Margolis
                                               United States Magistrate Judge

---

that plaintiff had gone into hiding at a woman's shelter to escape abuse. (Tr. 86). Dr. Hahn noted that contrary to Dr. Shamsi's finding that plaintiff "may have paranoid delusions[]" (Tr. 368), there was a basis for plaintiff's fear, which "does not seem to be a delusional fear." (Tr. 86)(emphasis omitted).

     Furthermore, as Dr. Hahn noted, Dr. Shamsi's conclusion as to plaintiff's inability to work is not supported by his own assessment that plaintiff has mild anxiety and moderate depression, intact memory, and moderately decreased attention and concentration. (Tr. 86; see Tr. 368).